32849. ROBERTS et al. v. ATLANTA BAPTIST ASSOCIATION, INC.

MARSHALL, Justice.

The Atlanta Baptist Association, Inc., brought an action to enjoin the taxing authorities from collecting ad valorem taxes for tax year 1974 and thereafter on three tracts of land owned by the Association in unincorporated north Fulton County. The basis of the action is the

contention that all of the above property is a "place of religious worship," as that term was used in the then-existing Georgia Constitution and implementing statute, so as to exempt the Association from the payment of ad valorem taxes thereon. See Art. VII, Sec. I, Par. IV of the 1945 Constitution of Georgia (Code Ann. § 2-5404); Code Ann. § 92-201. The defendant tax assessors had assessed for taxes in 1974 two out of the three tracts involved, viz., a 10-acre island in the Chattahoochee River and a 45.8-acre tract, which was contiguous to the 46.2-acre, tax exempt tract. The two mainland tracts were separated by a creek. The jury returned a verdict exempting the 45.8-acre tract, and finding the island tract not exempt. The trial judge entered judgment on the verdict, enjoining the defendants from assessing or collecting ad valorem taxes on the two contiguous tracts, from which judgment the defendants appeal.

The following evidence was adduced at the trial. The property in question has been owned and operated by the Association since 1951 as a religious retreat assembly, known as "The Atlanta Baptist Assembly." Although the property was formerly assembled from separate parcels of land, it has been considered and operated by the Association as one entire tract. The property was exempted from taxation until 1970, when there was an attempt to deny its exemption in its entirety. Litigation in Fulton Superior Court in 1971 resulted in a verdict and judgment in favor of the Association that the entire property was "a place of religious worship." It remained exempt until the assessment notice for calendar year 1974, which is the basis for the present action.

The property is financially supported by the Association, with its spiritual program controlled by decisions made in monthly meetings of the Executive Committee of the Association, which is composed of ministers of the approximately 125 Baptist churches located principally in Fulton and DeKalb counties.

The 46.2-acre tract adjoining the tract in question is admitted by the defendants to be tax exempt as "a place of religious worship." This tract has a number of improvements, including the resident minister's residence; single family dwellings where personnel

resided who had superintendent and caretaker responsibilities; a lodge building containing dining room, kitchen and dormitory facilities; a chapel building used by North River Baptist Church, also containing dormitory facilities and an office for the resident director; a gymnasium; and other buildings used as dormitories.

The director of the camp, Mr. Paul McNeal, has a B. S. degree in Religious Education from Mercer University and has dedicated his life to full-time Christian service. With regard to the tract in question, he testified that "[t]he main purpose is for *outdoor worship and spiritual —* all denominations use our facilities; our whole emphasis is to *offer a place for church groups to come out, to get away from their own church surroundings — time for renewal, rededication, for reaching the lost people for Christ;* and this area to the left is used mainly for that purpose. Our buildings — as has been stated before, all our buildings are on the right-hand side; and as *most of our groups are large, or too large to — accommodate them in these buildings, and they wanted to use this outside area,* they requested the area — the prayer garden has been mentioned, the galley, and — areas around the lake, which is . . . [o]*n the left side of the creek . . ."* (Emphasis supplied.) McNeal further testified that on the right side of a lake, which straddles the boundary line between the two tracts, a "Galilean" or "Fire" outdoor worship service is conducted, including hymn singing, Bible study, and an opportunity to make a commitment for Jesus Christ. Every group that attends services in the camp uses this area. A lighted cross, used in such services, is located across the lake, on the tract in question. The prayer garden, also in the "left-hand" tract, is a general assembly area, from which the attenders break up into smaller groups with spiritual leaders and go into the wooded area on the left side of the creek to various meeting areas which are separated by woods in order to buffer them from other groups and to preserve the overall theme of Christ teaching beside lakes, streams, in gardens, etc.

The attenders are generally youth groups of grammar school, high school and college age, of various denominations, including Catholic, under the direction of ministers and Christian lay workers of the various

religious groups. The natural, wooded areas have a strong appeal to the youth. They carry out planned programs approved by the director of the Atlanta Baptist Assembly for their spiritual emphasis. Every week some group is in attendance at the Assembly, and on many occasions more than one group at a time. Attenders totaled several thousand per year, with group sizes numbered from a few dozen to over 100. The groups disperse to various meeting sites on the entire property (including sites identified as being located on the left side, or the tract in question) for planned scripture study, religious songs, testimonies, sermons, and group discussions led by religious counsellors. Many groups attended preparatory to revivals in their churches. There was testimony of observances of Holy Communion (Lord's Supper) and performances of weddings on the tract in question, a baptism in the river adjoining the contiguous tract, and use of the 10-acre island on various occasions by youth groups that were selected from those attending other religious retreat assembly meetings. *Held:*

The appellate courts of this state have wrestled on several occasions with the problem of defining the phrase "places of religious worship." The problem is complicated by the absence of any definition in either the Constitution or statutes, by the fact that "worship" means different things to different people, and by the variety of factual situations, which often involve places of multiple usage, making it sometimes difficult to determine which usage is the primary one. In *Leggett v. Macon Baptist Assn.,* 232 Ga. 27, 28 (205 SE2d 197) (1974), this court stated the general rule that, "in applying the exemption authorized by basic Georgia law to the facts in the individual case, we must look to the . . . primary use of the property to determine whether it is exempt from taxation."

In *Leggett* supra, Division II, the court examined previous cases and concluded that, at best, "these cases express a 'feeling' that the words 'religious worship' import a concept of a congregation assembling in a place open to the public to honor the Deity through reverence and homage." After citing from Webster and Black's Law Dictionary, the court stated, "These definitions express, we believe, the generally accepted public notion of

thinking of worship in terms of congregational worship services intended to express adoration and homage for the Deity. For the Christian Church Universal, this would include saying prayers, singing hymns, reading scriptures, and the giving of testimonies and sermons in a congregational setting. It would also include the traditional sacraments and rites of baptism, marriage, communion and funeral services." *Leggett* went on, at p. 31, to stress "congregational worship services and administration of traditional sacraments" as essential elements of "public worship."

Looking at the evidence in the case sub judice vis-a-vis the criteria above noted, we find that virtually all of the essential elements of "religious worship" have been shown to exist with reference to the tract in question. It was "open to the public" in that it was shown to have been used by all denominations, including Catholic, and by diversified groups, including "ghetto" groups. The only element of "worship" mentioned by the previous cases which was not shown to have been conducted on the property was funerals. In this regard, however, this court has held that "[i]t is the rule that all grants of exemption from taxation must be strictly construed in favor of the State, and that nothing passes by implication, *but this rule must not be pushed to unreasonableness. Rayle Electric Membership Corp. v. Cook,* 195 Ga. 734 (25 SE2d 574)." (Emphasis supplied.) *Church of God v. City of Dalton,* 213 Ga. 76, 78 (97 SE2d 132) (1957). Even if funerals are considered as "worship," to say, because this one element of worship was not present, that the place was not one of religious worship, would be to push the rule to unreasonableness, which we have said we will not do. In many churches it is customary to hold funerals at funeral homes rather than in the church building. In other words, the mere absence of some element of worship does not, alone or automatically, negative the place as a "place of religious worship."

Another unreasonable limitation, which is urged by the appellant taxing authorities, is that "places of religious worship" has been construed by our courts to apply solely to buildings. The following language in *Leggett,* 232 Ga. 27, supra, at p. 31, is the contended basis

for this argument: "[T]he decision we reach here is consistent with the view held generally in a number of other jurisdictions that exemptions from taxation of places of religious worship, unless stated otherwise, are intended *primarily* to apply to buildings where congregations come together in a public forum for religious services.[Cits.]." (Emphasis supplied.) Had there been any legislative or judicial intention to limit "places" to buildings (which, of course, would have been obiter dictum in that case), the rule would not have been qualified by the adverb "primarily," which necessarily envisions situations similar to the present one, involving few or even no buildings. Rather, "primarily" indicates merely that most of the appellate cases have dealt with buildings. Indeed, this court in *Leggett,* supra, p. 30, cited an early Court of Appeals case which held (with reference to a criminal statute making it a misdemeanor to carry a weapon to a place of public worship) that "a *place of public worship* is not necessarily a church, nor is the term synonymous with a *church;* and, in the connection in which the words are used in [the criminal statute], they mean the gathering of individuals for public worship, at whatever place they may be, whether in the open air, under a tent, beneath an arbor, in a warehouse, and sometimes in an opera-house. Words are to be given their ordinary significance with special reference to the connection and sense in which they are used . . ." *Amorous v. State,* 1 Ga. App. 313, 316 (57 SE 999) (1907).

That the General Assembly and the citizens of Georgia never intended to place so narrow a restriction on this exemption, can be seen by the fact that both the Constitution section and the statute implementing it, cited hereinabove, contain the language, "this exemption shall not apply to *real estate* or buildings *other than* those . . . [described therein]." (Emphasis supplied.) Nor do the Constitution and statute employ the terms "house" or "church" of religious worship, which, arguably, might have limited it to a building. If the *presence* of the omnipotent and omnipresent God cannot be restricted to a mere man made edifice, surely it was not intended to limit the *worship* of such a God to a building. Neither is the fact that fewer members than a complete, separate, organized

church met in this assembly, controlling.

Even in cases relating primarily to exemptions for "buildings" of colleges, this court has held that "the exemption embraces the land adjacent thereto necessary for their proper use, occupancy, and enjoyment." *Elder v. Trustees of Atlanta University,* 194 Ga. 716, 719 (22 SE2d 515, 143 ALR 268) (1942) and cits. The evidence in the case sub judice showed that the two contiguous tracts in the assembly or camp were principally or even exclusively used as a "place of religious worship." The jury was properly charged in accordance with the law hereinabove cited and the holdings herein. Accordingly the verdict and judgment with regard to the tax exempt status of the 45.8-acre, "left side" tract is affirmed. That portion of the verdict and judgment holding the 10-acre island to be taxable, is not reviewable on this appeal, no appeal or cross appeal therefrom apparently having been filed.

*Judgment affirmed. All the Justices concur, except Hall, J., who dissents.*

A<small>RGUED</small> O<small>CTOBER</small> 11, 1977 — D<small>ECIDED</small> J<small>ANUARY</small> 4, 1978 —
R<small>EHEARING DENIED</small> J<small>ANUARY</small> 18, 1978.

*Webb, Young, Daniel & Murphy, Harold T. Daniel, Jr., Joel Y. Moss,* for appellants.

*Perry O. Lemmons,* for appellee.